## Bright Pickett *v.* The State.

1. Charge of the Court — Implied Malice.— In a trial for murder the court instructed the jury that "Whenever it is conclusively shown that one person has killed another, and it does not appear beyond a reasonable doubt from the evidence that the killing was in pursuance of a design deliberately formed, as hereinbefore defined to you, and where there is no evidence which reduces or tends to reduce the killing to manslaughter or negligent homicide, or which excuses or justifies the killing, the killing is deemed in law to have been done with *express* malice." *Held,* that, though the context of the entire charge suggests the purpose of the court to use the word "implied" in the stead of "express," yet the use of the latter word in this charge, whether by intent or accident, is such error as necessitates reversal. This court is governed solely by the record, and cannot assume that errors are clerical in the transcription.

2. Practice.— When, in a felony trial, inquiries of an improper nature are persisted in by counsel for the defendant, and the retort of the State's counsel is such as to prejudice the rights of the defendant, the whole duty of the court is not discharged by rebuking counsel, but the jury should be instructed that they are not to be influenced by such improper conduct.

Appeal from the District Court of Denton. Tried below before the Hon. C. C. Potter.

By bill of indictment returned into the District Court of Denton county, Texas, September 14, 1881, the appellant was charged with the murder of Henry Williams, on July 7, 1881. The trial resulted in a verdict of murder in the first degree, with a life-term in the penitentiary awarded as punishment.

The difficulty which culminated in this homicide grew out of a proposed wrestling-match between the defendant and the deceased. The statement of facts is very voluminous, and forms a large part of the record. Only so much is given as will suffice to disclose a clear and comprehensive history of the case.

John Evans was the first witness for the State. He

testified that he was acquainted with the defendant, but did not know the deceased personally, and only learned his name and saw him on the day of the killing. The homicide occurred in the town of Roanoke in Denton county, on the 7th day of July, 1881. When the witness, who was at work at the railroad depot, reached town that day, he saw the two men together, and heard their conversation about the wrestling-match. The proposition was to wrestle for a horse. The deceased said that he had no horse, but that if he could procure one he would bet it, and offered to bet ten dollars. He went off for a horse, procured it, returned and told the defendant that he, the defendant, would have to put up twenty dollars to boot. They disagreed about the value of the horses, and agreed to leave the value to disinterested parties. The defendant refused to put up twenty dollars. The witness went off and was gone some time, and when he returned the parties were between two houses talking about wrestling. The witness went off the second time, and, when he returned, took a seat on a goods-box near the sidewalk. The defendant came out of a neighboring saloon, whittling with a knife, and remarked that the whole crowd was against him. The deceased was in front of him, and near the corner of the house, and east of the saloon. The defendant walked through the crowd up to him, when the deceased placed his hand on the defendant's shoulder lightly, and remarked: "My friend, I have nothing against you, but if I wrestle with you, I will throw you down." At this point the defendant said: "I'll just rip you," and struck deceased with a knife. As the latter turned off, the defendant struck at him again. The deceased then ran, the defendant following him some thirty yards. The defendant returned and asked "Where is that other son of a b—h?" The defendant then got on his horse and rode off. The deceased ran sixty or seventy yards from where he was cut before he

fell. The witness saw nothing in his hands at the time of the killing.

The cross-examination of this witness effected no material change in his testimony, nor did it elicit anything new, except that, when the defendant went up to the deceased in the crowd at the time of the cutting, the latter was doing nothing of a threatening character, nor was he making any demonstrations of violence, but, on the other hand, seemed trying to pacify the defendant, who seemed excited and agitated.

Harvey Cook next testified for the State. There was no substantial difference between his testimony in chief and that of Evans as to the material facts, except that this witness states that when the defendant approached the crowd at the time of the cutting he said: "It seems you are all against me, and I hate to be in such a fix." The deceased replied that he did not think everybody was against him, for he was not. The defendant responded: "You have been bluffing and running over me all evening. I am a son of a b—h, you d—d son of a b—h," and cut him with a knife, near the heart.

On cross-examination the witness stated that, when the defendant spoke to the deceased, the latter's hands were hanging down by his side, but when he replied he placed them on his hips. He at no time laid his hand on defendant's shoulder. "Pickett did not say: 'I am a son of a b—h, you d—d son of a b—h;' nor say: 'I will rip you.'" The witness did not hear the defendant say, on his return from chasing the deceased, "where is that other son of a b—h?" He heard him tell his father to turn him loose, and nothing more. When the first lick was struck Isham Griffith broke and ran.

Re-examined, the witness testified that Griffith started to run about the time the cutting commenced. The defendant did not seem much excited until a short time before the cutting. When the witness first saw him,

he had the knife in his hand, with his finger on the blade. The witness saw the body of deceased examined, and saw a closed pocket-knife taken from one of his pockets.

As to the occurrences in the crowd at the time of the cutting, the testimony of H. F. Foy is similar to that of Evans and to Cook's in chief, except that he testified that when deceased told the defendant that he was not against him, the defendant replied, "You are a d—d son of a b—h." Previous to this, the deceased had said, "I am not against you, but, by G—d, you have not got the grit to wrestle."

Isham Griffith, the most important witness for the State, testified, in substance, that he first saw the deceased on the day of the killing about 3 o'clock, and had seen the defendant before that hour, when he came to the store and inquired for the deceased, asking, "Where is that wrestling man?" The witness and Charles Colston hunted up the deceased, finding him in a neighboring store, disengaged, and told him that defendant wanted to see him. The party walked together to a saloon, and as the deceased stepped into the door, the defendant said, "Hallo, do I look like the man you throwed down?" The deceased said, "I did throw you down at Elizabeth." The defendant replied, "You did not; your hair is too d—d short to throw me down," to which the deceased answered: "If my hair is short, it lies G—d d—d close to my head." He further said: "I will bet ten dollars that I can throw you down." The defendant replied: "I have no money, but I have a good ninety-dollar rig out there that I will bet you." After some more talk, the deceased went off to get a horse to bet against the defendant's horse, and when he brought the horse to the back of the saloon where the defendant was, he said: "You will have to put twenty dollars on top of your horse." The defendant said that the boot was the other way, and

that he must have twenty dollars. They disagreed about the value of the horses, and there was talk of selecting a man each to value them; then the defendant went off. The deceased selected Mr. Wood as his man, and went to where the defendant was and said: "I am ready;" to which the defendant made no reply. Deceased then said: "Bright, you would not wrestle with me if I would give you ten dollars." The defendant replied, "try me and see." The defendant went into the saloon again and remained about ten minutes; when he returned he said to the deceased: "I am a son of a b—h, you d—d son of a b—h," and struck the deceased with his right hand, in which he had a knife.. The witness then ran home. He heard the defendant when he came back from chasing the deceased say, "Where is that other son of a b—h?" All the talk between them about the wrestling seemed friendly.

Beyond the fact that this witness was throughout encouraging the deceased in his efforts to get up a wrestling-match with the defendant, and that he offered his horse with the advice to the deceased to bet two to one in order to get up the match, and that, when he ran away after the cutting, it was because he thought the defendant referred to him when he asked: "Where is that other son of a b—h?" the cross-examination developed nothing of an interesting nature, nor did it change the testimony in chief, in any particular.

The substance of the testimony of Marion Moon, for the State, was that, shortly after he had heard some talk between the parties about the proposed wrestling-match, he met the defendant in the saloon. The defendant asked him if he had a good knife, and the witness replied that he had no knife at all. The defendant then said that if the deceased did not quit blowing and let him alone, he would cut him. The witness advised him not to cut the deceased.

T. J. Cook, for the State, after detailing some of the conversation between the parties, stated that, a short time before the cutting, the defendant called him from the crowd and told him that the crowd was all against him, the defendant. The witness advised him to get away from them and drop the matter. The defendant went off a short distance, sat down on the sidewalk, and leaned his head on his hands. At this time the deceased approached him, and said: "Bright, you are afraid to wrestle; you have backed out, and would not wrestle if I paid you ten dollars to do so." After this, the defendant approached the witness in the saloon, and asked him if he had a good knife, saying that he would "cut h—ll out of some of them." The witness advised him to let them alone. Before this, the defendant said to his brother in the saloon: "I am going to have h—ll with some of these fellows; come out and see it well done." His brother told him to behave himself, and stay in the house. The defendant went out the back door, and when the witness next saw him he and deceased were facing each other. The witness heard the defendant say, "you are all against me," and, after some reply from deceased, "I am a son of a b—h, you d—d son of a b—h;" when he struck the deceased. The witness then detailed the subsequent occurrences exactly as the previous witnesses had.

Eddie Patterson, for the State, testified that he was in his father's store in Roanoke on the evening of the difficulty. A short time before it occurred two men entered the store through the back door, and one of them asked to look at some pocket knives. He selected one and said he would pay for it before he left town, and then went out with it before the witness could say whether or not such an arrangement was all right. The witness did not know the defendant, and remembers nothing of the man who got the knife by which he could now identify him.

Two of the Pickett family present at the trial resembled the man who got the knife.

Tobe Wyatt was the next State's witness. . He testified that the first he saw of the defendant on the day of the difficulty was when he, the defendant, rode up to the back of the saloon, looked in and asked for the deceased, saying that he wanted to see him, as he had heard that deceased had boasted of throwing him down. When the deceased presently entered the saloon, the defendant exclaimed: "There is the d—d cuss that says he threw me down;" to which the deceased replied that he had thrown him, and could do it again. Here the arrangements for the betting commenced, and the witness's narrative of subsequent events is substantially the same as that given by preceding witnesses. He stated, however, with more particularity than others that, immediately after the last interview between the parties before that in which the collision took place, the defendant left the crowd, going through the saloon at the front door, out at the back door, south to some other houses, and returned to the crowd by the same route, with a knife in his hand, flipping the blade, and commenced the conversation with the deceased which resulted in the cutting.

The residue of the evidence for the State is but a repetition of the material facts, with little variance of detail, but showing a persistent effort on the part of the deceased, abetted by Griffith and others, to bring about a wrestling-match between the deceased and the defendant for a wager, but showing no manifest intention to force a violent or hostile encounter.

P. M. Bond, for the defendant, testified that he was in Roanoke on the day of the difficulty, and there met the defendant, who said to him: "They are trying to run a blind calf over me." After that he heard the deceased say that he was going to "make the d—d son of a b—h wrestle or leave town that day." Deceased was on horse-

back at the time, and his tone of voice was that of a person bullying over some one. Griffith was standing behind the deceased at one time when the witness heard the defendant and the deceased talking about the wrestle.

Cross-examined, the witness stated that in the several conversations about the wrestle, the deceased did most of the talking. Preceding the cutting, when the defendant was sitting on the sidewalk, the witness heard the deceased say to the defendant: "You have got no nerve, no grit, no disposition to buck up to a man," and that he, deceased, was "going to wrestle anyway;" during which time he was making violent demonstrations with his hands. There was no one near the deceased when the witness heard him say that he was going to make the defendant wrestle, nor did the witness know who he was talking to. The defendant was then back of the saloon, about one hundred yards away.

W. H. Burbee, for the defense, testified that about five minutes before the cutting occurred the deceased came into his shop to get him to value a horse for him, and said: "We are after him; we are going to have that wrestle." The witness refused to go, saying that he and defendant were not on good terms. He said to the deceased: "If you don't quit following Bright around, he will hurt you." Deceased persisted in urging the witness to go out and value the horse, saying that if he would do so, they would be able to have the wrestle. The witness repeated that if deceased did not let the defendant alone, he, being young and passionate, might cut him. The deceased, who was sitting, rose up, ran his hand into his right-hand pocket and said: "G—d d—n him, I will cut his guts out, as I can cut, too." The witness did not say: "Williams, you had better look out; Bright is not going to wrestle with you, but he will cut you with a knife; I know him." The witness had seen the defendant walking around, looking like he was bothered, and had seen

the crowd around him.   Had seen him pass witness's back door several times.

The witness was acquainted with O. J. Woods, and had had some talk with him since being summoned as a witness in this case.   He had not told Woods or Patterson that he told the deceased that day "to look out; that Pickett is not going to wrestle with you, but will cut you."   The witness had talked with several of the Picketts about the case after the killing, but had never talked with the State's counsel.   He had refused to disclose to the district attorney what his testimony would be.   He was not acquainted with the district attorney, although that officer had told him who he was, and the witness had seen him talking to other witnesses.   He had talked a great deal with the defendant's counsel, his reasons being that he was well acquainted with them.

Ike Davis testified for the defense that, on the Tuesday before the killing, the deceased asked him in a saloon in Roanoke if he knew where the defendant was; to which he answered that he did not.   The witness then asked Henry Pickett where the defendant was, and Henry replied that he had gone to Fort Worth.   The deceased then said to the witness: "Bright Pickett is a rascal and a villain, and will not do anything that he says he will." The witness saw the defendant next day and asked him what was wrong between him and the deceased; to which inquiry the defendant replied that he knew of nothing. The deceased had the reputation of being a dangerous, violent and overbearing man.

On cross-examination, the witness testified that men who worked on the railroad with the deceased had told him that the deceased was an overbearing, quarrelsome and violent man.   When talking to the witness, in the presence of Henry Pickett and others, the deceased denounced the defendant as a liar, coward and villain, and as a man who would do nothing he promised.   The de-

ceased had the reputation of a bully' and a gambler. Portman Cook on one occasion told the witness that he had to drive the deceased from his tent for gambling. George and Jeff. Cook also spoke to the witness about the deceased gambling. The witness had never said more to the defendant about his conversation with the deceased than to ask him what was wrong between them.

C. P. Cook, for the defense, testified that the deceased was regarded as a violent, quarrelsome man, and stated on cross-examination that he had heard William Foster, Marion Smith and others speak of him as such. By violent the witness meant that he was overbearing. He did not regard the deceased as a dangerous man.

The State re-called W. H. Burbee and asked if he remembered a conversation he had at a given place with O. J. Wood, Mr. Brown, "Old Man" Brown and Mr. Patterson, just before the killing, in which he said that he had told the deceased that he knew the defendant, and that he was a dangerous man and would not wrestle with the deceased, but would cut him with a knife, and that he had better look out. The witness admitted the conversation with Patterson, during which he thought the other parties were present, but denied the statements imputed to him, farther than what he had before stated on the stand; that is, that if they did not let the defendant alone and quit following him around, he would cut some of them.

O. J. Wood, for the State, in rebuttal, testified that just before the killing, in the presence of Patterson, he heard W. H. Burbee say that he had just told Williams that Pickett was a dangerous man; that Pickett was not going to wrestle with him, but that if he did not look out Pickett would cut him with a knife.

Cowan and Patterson testified that the deceased's reputation as a peaceable and law-abiding man was reasonably good — "about on an average." Jeff. Cook testified that he was regarded as something of a bully, but not as a dangerous man.

*Piner & Smith, M. Fulton* and *Crawfords & Smith*, filed an able and exhaustive brief, but too lengthy for insertion.

*H. Chilton*, Assistant Attorney General, for the State. The language of the district attorney was provoked by the questions asked by defendant's counsel. Surely, a prosecuting officer is not bound to fold his arms and allow defendant to blacken the character of deceased by innuendo. A defendant must take the peril of being overwhelmed by the storm which he raises. It will be noticed, in addition, that the language of the prosecutor was only inferentially aimed at defendant.

The bad character of deceased was so fully examined in defendant's testimony that no error of the court on this point during the giving of the State's testimony can be deemed important.

The district attorney withdrew his objections, and this would cure any error in the previous ruling. But the ruling was not bad. When made, no testimony of former threats had been introduced, and in this state of case evidence of bad character was irrelevant. Penal Code, art. 608.

Hurt, J. The appellant Pickett was convicted of murder of the first degree, his punishment being assessed at confinement in the penitentiary for life.

Upon express and implied malice the court below charged as follows: "4th. Express malice is when one, with a calm and sedate mind and a deliberate and formed design, in pursuance of such design, doth kill another; which condition of mind is usually evidenced by external circumstances, such as lying in wait, antecedent menaces, former grudges, deliberate acts of preparation, etc. You will notice from the foregoing definition of *express* malice, that, in order to constitute a killing upon express malice, the mind of the slayer must be

cool and sedate, and while in this condition he must have formed the design to kill and have actually killed the party in pursuance of such formed design; or, if the design to kill was formed when the mind was excited and agitated, then, in order to make the killing upon express malice, there must have been time for the mind of the slayer to cool and for him to deliberate upon the character of the act he was about to commit, before the killing occurred. And if the killing occurred while the mind of the slayer was agitated from any cause, so that the same was incapable of cool reflection upon the character of the act he was about to commit, then the killing could not be upon express malice. By the words ' calm, cool and sedate' is not meant that the mind must be entirely free from agitation, but only sufficiently so for it to understand and reflect upon the nature of the act.

" 5th. Implied malice is where one party kills another without the circumstances and formed design as are required to constitute a killing upon express malice, but under such circumstances as do not reduce the killing to manslaughter or negligent homicide, or which excuse or justify the killing.

" 6th. Whenever it is conclusively shown that one person has killed another, and it does not appear beyond a reasonable doubt, from the evidence, that the killing was in pursuance of a design deliberately formed, as hereinbefore defined to you, and where there is no evidence which reduces or tends to reduce the killing to manslaughter or negligent homicide, or which excuses or justifies the killing, the killing is deemed in law to have been done with *express* malice."

This sixth paragraph is clearly erroneous; so palpably so that it requires no analysis to make the error appear. If *implied* instead of *express* had been inserted, it would not have been objectionable as a charge upon implied malice. From the preceding paragraphs and its own con-

text, we believe this charge was intended to apply to implied malice, and that the word *express* was not intended, or that there was a mistake in the transcript. We, however, must be governed by the record.    Assuming this charge to have been given, which we are compelled to do, the judgment must be reversed.

There are twenty-three errors assigned, quite a number of which refer to supposed errors in the charges given, and some to errors in not giving the charges requested by defendant. Suffice it to say that, after a very careful examination of the charges given and refused, we have not discovered anything wrong or erroneous in these respects. We have not time to discuss these assignments; to do so, would lead us into a field which embraces almost all the law upon culpable homicide.    There are no new questions presented and hence no necessity.

Other assignments are based upon supposed irregularities in the trial; these will not arise upon a new trial. But we deem it our duty to give, in more than a passing notice, our views or opinion on the remarks of the district attorney.

It appears by the record that the character of deceased as a dangerous and violent man was in issue; that one O. J. Woods was on the stand as a witness for the State, and that defendant's counsel asked the witness "If he knew of deceased Williams knocking a man down at a horse race and dragging him over the ground for the amusement of the crowd?"    To this the State objected, and the objection was sustained.    The defendant's counsel then asked the witness "if he knew about deceased having three fights in one week at preaching at the Lonesome Dove school house."    To this the State's counsel objected in a somewhat excited manner, and stated "that it was apparent that the defendant's counsel were seeking by illegal questions to prejudice the rights of the State, and if they persisted in it that they, the State's

counsel, would prejudice the rights of defendant,— that they would allude to an innocent man being quirted to death," and at this time pointing his hand in an excited manner at defendant. At this point the court interfered and rebuked counsel on both sides for their improper conduct.

Concede that the defendant did not have the right to prove individual acts of deceased tending to show him a violent and dangerous man, still his counsel may have believed that he was, under the circumstances, entitled to this proof. Again, the counsel may have known that these questions were not legal; still, if not objected to, defendant would have had the right to make the proof. The second attempt to prove similar acts may have been with the view of embracing the ruling of the court in one bill. If these questions were propounded continuously, or with intent to prejudice the rights of the State, it was the duty of the court to have repressed and rebuked the counsel for defendant. The court did not do this until after the remarks of counsel for the State; and hence we infer that the conduct of counsel for defendant was not considered improper by the court, or action would have been taken before it was.

Be this as it may, this defendant being on trial for his life, there was no excuse for the learned counsel for the State to so far forget himself and make the remarks above referred to. The court below rebuked counsel on both sides. Whether those for defendant were deserving it we are unable to decide, having no knowledge of their objects or intentions; but this rebuke, whether merited or unmerited, was not the whole duty of the court. It being evident that the remarks of the State's counsel were intended to prejudice the rights of defendant, and being in their nature calculated to have that effect, the court should have instructed the jury upon their duty in regard to this matter. The jury should have been told

in effect and in unmistakable terms that they must try defendant by the evidence, and to disregard these remarks. We have very serious doubts as to the action of the court in overruling the motion for a new trial based. upon this matter, but we feel confident that upon an another trial this conduct will not be repeated.

For the error in the charge, the judgment is reversed and the cause remanded.

*Reversed and remanded.*